STATE OF NEW JERSEY, PLAINTIFF, v. ERIE RAILROAD
COMPANY, A CORPORATION OF NEW YORK, LEHIGH
VALLEY RAILROAD COMPANY, A CORPORATION OF
PENNSYLVANIA, NEW YORK CENTRAL RAILROAD
COMPANY, A CORPORATION OF NEW YORK, THE
DELAWARE, LACKAWANNA AND WESTERN RAILROAD
COMPANY, A CORPORATION OF PENNSYLVANIA,
READING COMPANY, A CORPORATION OF PENNSYL-
VANIA, AND THE CITY OF JERSEY CITY, DEFENDANTS.

Decided June 11, 1945.

For the plaintiff, *Walter D. Van Riper,* Attorney-General, and *Benjamin V. Van Tine,* Assistant Attorney-General.

For the defendant railroads, *Edward A. Markley* and *Maximilian M. Stallman* (*Raymond J. Lamb,* of counsel).

For the defendant City of Jersey City, *Charles A. Rooney* (*Charles Hershenstein* and *Milton B. Conford,* of counsel).

OLIPHANT, S. C. C. By virtue of agreement between all parties these cases were tried by the court, sitting without a jury. Stipulations of fact were entered into and there exists at present no controversy as to any fact. It was further agreed and stipulated that a finding in the case wherein the Erie Railroad Company is defendant would apply with equal force and effect to all of the defendants except as to the bankruptcy proceedings of that company affecting its payments.

It was further stipulated that should the court determine that there shall be any additional sums due the plaintiff, the state will then have the opportunity to offer testimony before the court, or a master, to determine the amount thereof.

The complaint is in five counts, one against each defendant, that against the Erie Railroad Company being contained in the first count. It is filed under the authority of *R. S.* 54:27–4; *N. J. S. A.* 54:27–4, and seeks the recovery in excess of $12,000,000 claimed to be owing to the state by the defendants.

By order of the late Mr. Justice Porter dated November 28th, 1944, the City of Jersey City was made a party defendant. The facts succinctly stated are as follows:

The defendant did each year from 1932 to 1940, inclusive, make partial payments, subsequent to default, on the taxes levied on its property and contested the remainder.

When these payments were made, the defendant directed that they be applied to principal taxes, not on interest thereon. The state through its Comptroller accepted them as such, issued receipts therefor, and so credited them on its books of account. The state concedes that its Comptroller accepted and used these payments made by the defendant knowing that they were intended by it as payments on account of principal.

In several instances the state through its agents, the Comptroller, Treasurer and Attorney-General by various documents

set forth that the payments had been accepted as such against principal, particularly in proceedings in the federal courts and in the information suits filed by the Attorney-General in the Court of Chancery, which are hereafter referred to, also on occasion when specific parcels of land were sold by the defendants.

Most of the payments were in two categories. (1) Those made pursuant to orders of the United States District Court in connection with their grant to the defendant of injunctive relief, and (2) those made by the defendant at the conclusion of the 1932-1933 litigation by the denial of a writ of *certiorari* by the United States Supreme Court and the filing of a petition by the Attorney-General under *R. S.* 54:28–1; *N. J. S. A.* 54:28–1.

On July 22d, 1941, what has been termed "The First Railroad Settlement Act" was enacted into law. Laws of 1941, chapter 290, *N. J. S. A. Append. A:* 4–7.1, *et seq.* In that act, it was provided that payments made thereunder should be accompanied by waiver documents and other papers in such form as the Attorney-General might require. He never approved or prescribed any such forms. The act further provided that interest on delinquent taxes be at the rate of three per cent. per annum instead of one per cent. per month as previously provided for. *R. S.* 54:27–4; *N. J. S. A.* 54:27–4.

Notwithstanding the Attorney-General never specified or approved any waiver or any forms the defendant delivered to the Comptroller on August 4th, 1941, its certified check in the sum of $4,822,603.17 in payment of what it assumed to be its full tax delinquency with interest at three per cent. from December 1st, 1940, to August 4th, 1941, and same was receipted for and retained but not deposited or used by the state. On September 4th, 1941, the Attorney-General filed a civil information in the Court of Chancery challenging the constitutionality of chapter 290, Laws of 1941.

On May 21st, 1942, chapter 241, Laws of 1942, *N. J. S. A. Append. A:* 4–7.1, *et seq.*, became effective. This legislation has been termed "The Second Railroad Settlement Act" and on the same day the Attorney-General filed a supplemental information and obtained a restraining order restraining the

State Treasurer from accepting or depositing any check from any railroad taxpayer. As heretofore stated the Treasurer had not deposited or collected the check delivered to him on August 4th, 1941.

The final decree of the Court of Chancery on said information was filed September 28th, 1943, which declared the "Settlement Acts" unconstitutional. *Wilentz* v. *Hendrickson,* 133 *N. J. Eq.* 447; 33 *Atl. Rep.* (*2d*) 366. This was affirmed by the Court of Errors and Appeals. *Wilentz* v. *Hendrickson,* 135 *N. J. Eq.* 244; 38 *Atl. Rep.* (*2d*) 199. Thereupon on July 11th, 1944, the defendant delivered to the Comptroller its checks, which with the checks theretofore delivered on August 4th, 1941, represented what it assumed to be its full tax delinquency, with interest thereon at the rate of one per cent. per month computed to July 22d, 1941, and at three per cent. after that date. Said interest payments at three per cent. per annum were computed on the basis of crediting all payments or tenders made on account of taxes subsequent to July 22d, 1941, as of the date of such tenders or payments with no interest computed or paid thereafter on the amount of such payments.

The payments were accepted without prejudice to the state claiming that the defendant owed more in principal than was covered by the payments, due to the claim that prior payments should have been credited first against interest and then against principal and that the payments should be credited as of July 11th, 1944, rather than the date on which the checks had been delivered to the State Treasurer. Thereafter on July 15th, 1944, final payments were made, the state accepting same without prejudice to its claiming more due in principal by reason of previous application to principal rather than interest and as to the rate of interest applicable.

The issues presented for determination by the court are:

I. Should the partial payments made by defendant on account of delinquent principal taxes made between December 1st, 1932, and July 22d, 1941, be credited against such principal taxes to the exclusion of the interest due thereon and if not, how should they be applied?

II. Were the payments made by the defendant pursuant to

and subsequent to the passage of the "Settlement Acts" payment of taxes and valid and sufficient to stop the running of interest on the principal taxes as represented thereby?

III. Is the interest rate computable subsequent to July 22d, 1941 (the effective date of the first Settlement Act) to be calculated at the rate of three per cent. per annum as provided for therein or at the rate of twelve per cent. per annum pursuant to the provisions of *R. S.* 54:27–4; *N. J. S. A.* 54:27–4?

IV. Should the payments made by the defendant in July, 1944, be appropriated to principal and interest in the amounts designated by it, notwithstanding that on said date it may have owed more in interest than it was then purporting to pay; or should such payments be applied in some other manner?

## I.

The situation here presented is not that of the usual debtor and creditor relationship. A tax, in its essential characteristics, is not a debt, nor in the nature thereof. It is an impost levied by authority of government upon its citizens or subjects. It is not founded on contract or agreement. It operates *in invitum*. It does not automatically carry interest. *Camden* v. *Allen,* 26 *N. J. L.* 398. Taxes and interest are distinct things and a tax not being a debt in the legal sense does not automatically bear interest, if delinquent, unless the legislature so provides. Interest does not inhere in the tax as a legal incident. It is not taxation but a punitive sanction for compelling timely payment. It is compensation for delay in payment. *Burlington County* v. *Martin,* 128 *Id.* 203; 25 *Atl. Rep.* (*2d*) 17.

Accrued interest as well as the tax becomes one indivisible lien and merges in the debt due from the company to the state. *Wilentz* v. *Hendrickson,* 133 *N. J. Eq.* 447 (at *p.* 466); 33 *Atl. Rep.* (*2d*) 366. Delinquent interest was compensation which together with the unpaid principal taxes merged and constituted the debt. *Wilentz* v. *Hendrickson,* 135 *N. J. Eq.* 244 (at *p.* 249); 38 *Atl. Rep.* (*2d*) 199.

The debt or debts owed by the defendant did not consist of several debts, except as for each tax year, nor a debt consisting of more than one incident. Principal and interest constitute for each tax year a single tax debt. The accrued delinquent interest was rather a bookkeeping item of the debt.

While *R. S.* 54:27-4; *N. J. S. A.* 54:27-4, provides for and permits partial payment of taxes, it cannot be read to imply that partial payments can be made on principal while interest thereon is owing.

The first question presented is, has the debtor the absolute right to dictate that a payment shall be applied to principal to the exclusion of the interest accrued and due thereon?

This problem is one of first impression in this state.

The intervening defendant cites *Holcomb* v. *Holcomb,* 74 *N. J. L.* 257; 65 *Atl. Rep.* 855, and puts great stress thereon in support of its argument. An examination of the file discloses that the question here involved was not argued or considered by the court in that case.

The defendant railroad company relies strongly on *Benson* v. *Reinshagen,* 75 *N. J. Eq.* 358; 72 *Atl. Rep.* 954, 955. There the court said "The law undoubtedly is that the debtor may direct the application and if the creditor accepts the money, even though he does not assent to such application, he is bound to make it if he receives the money under such direction," citing 2 *Am. & Eng. Cycl. L.* (*2d ed.*) 435.

There can be no denying that that is the law but as stated in that opinion it is a too narrow and restricted exposition thereof. The same rule is found in 30 *Cyc.* (at *pp.* 1228, 1231).

There is no absolute right in the debtor, with no qualifications or restrictions, to have the payment credited to principal to the exclusion of interest. The acceptance of a payment with directions to apply such to principal constitutes a contract or agreement between the parties wherein they treat the interest as a demand separate and apart from the principal.

This theory, which I consider the proper rule, is best illustrated by the opinion in the case of *Kann* v. *Kann,* 259 *Pa.* 583; 103 *Atl. Rep.* 369. The court there said: "Ordinarily, interest is considered as incidental to or forming an integral

part of the principal debt upon which it accrues and not as a separate demand, but, when a payment is made on account of the debt there is nothing to prevent the parties from mutually treating interest as a demand separate and apart from the principal, so as to appropriate the payment to the latter rather than the former, if they see fit—a debtor in making a payment may demand its application to principal as against interest, and if it is accepted without immediate protest, such acceptance will be tantamount to an agreement to apply the money as directed, the creditor being bound accordingly—such circumstances constitute a contractual situation, and the court will not set aside agreements unless they are without consideration, illegal against public policy, made without contractual capacity, or induced by fraud, accident or a mistake of fact."

It was held in *Tooke* v. *Bonds, 29 Texas* 420, that where there is a single debt consisting of principal and interest the debtor could not, as a matter of right appropriate partial payments to the extinguishment of the principal in advance of the discharge of the interest but there is no reason why this might not be done by the mutual assent of the parties.

The same view was taken by the court in the case of *In re: Cunningham's Estate,* 311 *Ill.* 311; 142 *N. E. Rep.* 740, where the court said: "Where the claim of the debtor is a single debt, consisting of principal and interest the debtor cannot, as a matter of right, appropriate a partial payment to the extinguishment of the principal in advance of the discharge of the interest."

The Supreme Court of Montana in *Monidah* v. *Hruze, 62 Mont.* 444; 205 *Pac. Rep.* 232, in affirming a lower court decision said: "After an exhaustive review of the authorities, the court concluded that the debtor may stipulate at the time of making payment that the credit shall be given upon the principal, even though there is interest due, and, if the creditor accepts without protest, such acceptance will be *tantamount to an agreement* to apply the money as directed."  See, also, *Cohen* v. *Chicago, 377 Ill.* 221; 36 *N. E. Rep.* (2d) 220.

The law favors the payment of interest first.  40 *Am. Jur.* 794; 96 *Am. St. Rep.* 69.

In *Gwynn* v. *Whittakers' Adm'r,* 1 *Har. & J.* (*Md.*) 754, it was said "Money paid by the debtor must be first applied to extinguish the interest, and the surplus, if any, to consume so much of the principal, and the debtor has no election to make a different application."

If the payments made by the debtor were not voluntary, as is claimed by the state and intervening defendant there would, of course, be no right of application under any circumstances, but in view of the foregoing conclusions I have not deemed it necessary to determine whether or not some or all of the payments were voluntary or involuntary.

Neither the Comptroller, the Treasurer or the Attorney-General had authority or power to enter into contracts on behalf of the state. Their authority is circumscribed and limited by statute. These can be searched in vain for any delegation of contract power with reference to the application of partial payments on taxes due.

*R. S.* 52:19–11; *N. J. S. A.* 52:19–11, contains the only power given the Comptroller upon which the defendant could rely. That reads: "The Comptroller shall examine, audit, adjust and *settle* all accounts due to or presented against the state and certify the amounts adjusted or allowed, to the Treasurer after receipt or payment."

There was nothing between the state and the defendant to settle. There was no controversy as to the amount of delinquent principal taxes due or the amount of interest due thereon. The sole question confronting the Comptroller was as to which item the payments should be applied. This was a legal rather than an administrative problem. He had no choice. His clear duty was to protect the interests of the state to the fullest extent and to obtain for it the maximum revenue. It cannot be said that an agent of the state has authority to contract to the detriment, disadvantage or injury of his principal without clear delegation of such authority.

What the state's agents did was to, in effect, annul or cancel a financial obligation due from the defendant to the state. This the legislature could not do, much less its agents. *Wilentz* v. *Hendrickson, supra.*

A public officer can make for the government he represents

only such contracts or agreements expressed or implied as he is authorized to make. *Whiteside* v. *United States,* 93 *U. S.* 247; 7 *Wall* 666; *Fort Worth Cavalry Club* v. *Sheppard,* 125 *Tex.* 399; 83 *S. W. Rep.* (*2d*) 660.

"Every public officer is bound to perform his duties—primarily for the benefit of the public." 43 *Am. Jur.* 78. In 46 *Corp. Jur.* 1032, the following rule is stated: "Statutes delegating powers to public officers must be strictly construed, and all persons dealing with public officers must inform themselves as to their authority, and acts which are within the apparent but in excess of the actual authority of officers will not bind the government which they represent, unless ratified by it."

As for the Attorney-General, nothing that he did can be construed as contracting or agreeing on behalf of the state as to the appropriating of tax payments to principal rather than interest. If he had done so it was beyond the scope of his power and authority which he derives from *R. S.* 52:17–2; *N. J. S. A.* 52:17–2. What actions he may have taken in other proceedings could not bind the state in this suit. What he did in most instances was the result of information furnished him by the Comptroller's office based upon its theory of computation.

The defendant knew or should have known the limitation of the powers of the state's agents. The rule is stated as follows in 59 *Corp. Jur.* 173: "The powers of state officers being fixed by law, all persons dealing with such officers are charged with knowledge of the extent of their authority or power to bind the state and are bound at their peril to ascertain whether the contemplated contract is within the power conferred."

It was against public policy for an officer of the state to fail to obtain every tax dollar and all the interest thereon to which it was legally entitled. It was against public policy for the Comptroller to have attempted to relieve the defendant of the statutory pressure to make full payment of its taxes, consisting of the continuous running of interest against principal until that interest was paid. 17 *C. J. S., Contracts,* § 211, states: "As applied to a contract to which the

state, through any of its duly authorized agents becomes a party, public policy has been invaded when there lurks in the contract a mischievous tendency so as to be injurious to the interests of the state."

The defendant asserts and pleads that the state by reason of its course of conduct is estopped now from asserting and claiming its present method of retroactive re-calculation and re-application of the amounts and payments.

To prevail in this defense the defendant must show that the doctrine of equitable estoppel or estoppel *in pais* can be invoked against the state.

The collection and enforcement of taxes is a strict governmental function and vitally affects the public interest.

The law is well settled that estoppel must not be invoked against a state when it is acting in its governmental or public capacity, 31 *C. J. S., Estoppel,* 404, § 138, and that the government is not estopped by previous acts, conduct or mistake of its agents with reference to the determination of tax liabilities, 31 *C. J. S., Estoppel,* 434, § 147, and cases cited therein. 49 *Am. Jur.* (at *p.* 299), states the law to be "The state cannot be estopped by the unauthorized acts of its officers," citing *Chicago, St. P. M. & O. R. Co.* v. *Douglas County,* 134 *Wis.* 197; 114 *N. W. Rep.* 511.

It was held in *Mullen* v. *State,* 114 *Cal.* 578; 46 *Pac. Rep.* 670, that the state is not estopped from denying the validity of a contract made without authority even though the contractor has in good faith performed services under the contract, since he must at his peril know the authority of those who seem to act for the state. "The government is never estopped, as an individual or private corporation may be, on the ground that the agent is acting under an apparent authority which is not real; the conclusive presumption that his powers are known rendering such a consequence impossible." So here the defendant acted at its peril in its dealings with the Comptroller.

Even if the doctrine of estoppel could, in a proper case, be invoked against the state the factual situation presented here would not be sufficient upon which to do so. The necessary elements are not present. The defendant did not rely on what

the Comptroller did. That official did what he was asked to do by the defendant. Nothing that he did was intended to influence the conduct of the defendant in the amount or manner of its payments. Its acts were entirely self-determined. The essential element of reliance by the defendant on the acts of the state's agent has not been shown. *New Jersey Suburban Water Co.* v. *Harrison,* 122 *N. J. L.* 189 (at *p.* 194); 3 *Atl. Rep. (2d)* 623.

Even if all elements of an estoppel are present there can be none such against the state in tax matters if the representations were made by an officer lacking the necessary authority. *United States* v. *Globe Indemnity,* 17 *Fed. Supp.* 839; *Id.,* 2 *Cir.,* 94 *Fed. Rep. (2d)* 576.

There being no absolute right in the debtor to dictate the application of payments in the present factual situation and the state's agents having had no authority to contract or make agreements especially in these tax matters, on its behalf, and estoppel not being available as a defense against the state, we are led to the question of how the payments should be applied.

Were we not here concerned with the construction of a very detailed statute and had the legislature merely provided for the payment of interest on defaulted taxes, in view of my holdings hereinbefore expressed, I would determine that the rule laid down by Chancellor Kent in *Conn* v. *Jackson,* 1 *Johns Ch. (N. Y.),* 13, 17, and generally referred to as the "United States Rule," would apply. That has been followed in this state in *Meredith* v. *Banks,* 6 *N. J. L.* 408; *Stark* v. *Hunton,* 3 *N. J. Eq.* 300; *Baker* v. *Baker,* 28 *N. J. L.* 13; *dictum* by the court in *Holcombe* v. *Holcombe,* 74 *Id.* 257; 65 *Atl. Rep.* 855, and *Collerd* v. *Tully,* 77 *N. J. Eq.* 439; 77 *Atl. Rep.* 1079.

As has been shown, interest does not attach to defaulted taxes as a matter of course. Interest in such a case is a creature of statute and any matters incident and appertaining thereto must likewise follow all statutory requirements. It follows that we may have recourse to so-called rules of application only if the statute is silent on that score. Wherefore, it becomes necessary to examine the statute.

*R. S.* 54:27–4; *N. J. S. A.* 54:27–4, provides that "such taxes, or the unpaid portion thereof" shall bear interest from the date of default until finally paid. Thus partial payments were within the contemplation of the legislature when this provision became law. *R. S.* 54:26–12; *N. J. S. A.* 54:26–12, provides that, as a condition for prosecuting a writ of *certiorari,* a railroad company shall pay the amount of taxes not in substantial dispute. Thus under certain circumstances, it was required that partial payments be made by the railroad companies. It is quite obvious that the legislature intended that the amount of taxes not in substantial dispute should be fully paid and completely eliminated from the controversy, leaving only the disputed balance to be litigated, which balance would bear interest from the date of default to the date of payment. Neither of these statutory requirements could be literally complied with if we apply the "United States" rule. The same is true if we apply the rule advocated by the defendant company and sometimes referred to as the commercial rule. The only logical and workable construction that can be placed upon the language of the statute is that every dollar of tax was intended to carry its own interest burden in the event that such dollar of tax should be in default.

To explain—let us suppose that $1,000,000 of taxes are in default and a railroad company wishes to pay $100,000 on account. At the time of the payment of the $100,000, the Comptroller must divide that sum into two component parts so that one of them will represent interest at the statutory rate on the other for the period of the delinquency. The interest component will then be deductible from the balance of interest owing at the time the payment is made and the principal component will be deductible from the balance of principal owing at that time. The mathematical formula for accomplishing this result is feasible and easy of application. Any payment heretofore made by the railroad companies subsequent to default must be so adjusted as to accomplish this result.

This application of payments and construction, which is advocated by the state is logical, workable, understandable and

just. It is the only construction which is in complete harmony with the several statutory provisions hereinabove set forth. It is the only construction whereby one can refer to a balance of principal taxes and say that such amount plus interest from the date of default to the date of payment constitutes the true and full tax debt of a defaulting company to the state. While it deviates from the "United States" rule it does not repudiate it.

## II.

The defendant, when it made its payment on August 4th, 1941, knew the act in pursuance of which it was made had not been complied with, *i. e.,* that the payment and other documents should be in the form approved by the Attorney-General. While the certified check was received and receipted for by the Comptroller and the Treasurer it was never deposited or cashed, though retained.

The defendant who knew this situation, undoubtedly could have secured the return of its check but it preferred to let it remain in the hands of the Treasurer pending the outcome of the attack on the constitutionality of the "Settlement" acts. Even after the restraint imposed on the Treasurer by the decree of the Court of Chancery on May 21st, 1942, it continued to leave it in his custody.

The final decree of the Court of Chancery, *Wilentz* v. *Hendrickson, supra,* adjudged and decreed the "Settlement Act" as being in contravention of article I, section 20 of the constitution (*N. J. S. A.*), and null and void, and permanently enjoined the State Treasurer from carrying out or executing any of the provisions thereof. It therefore follows that anything done in pursuance thereof was of no force or effect.

## III.

The Settlement Acts having been declared unconstitutional and null and void in their entirety the interest rate subsequent to July 22d, 1941, must be calculated at the rate of twelve per cent. per annum as provided for in *R. S.* 54:27–4; *N. J. S. A.* 54:27–4.

## IV.

Despite the fact that the defendant designated exactly how much principal and interest it was intending to pay by the payments made in July, 1944, they must, of course, be applied on account of their tax debts in the same manner as is held hereinabove, with respect to the payments made by it between December 1st, 1932, and July 22d, 1941, and dealt with under the first issue. The exchange of receipts and correspondence between the Comptroller and the defendant in 1944 can no more affect the operation of the statute and the rights of the state than any of the various unauthorized acts of the Comptroller prior to that year. In order to apply the rule of partial payments herein adopted to the 1944 payments, however, it will be necessary for the parties to stipulate exactly what part of each of such payments was intended by the defendant to be applied to the respective tax debts of each tax year in arrears. If the parties cannot so stipulate, that issue will be referred to a master for determination.

If all parties can agree upon the amounts due, calculated in compliance with this opinion, I will enter judgment in those sums. Otherwise, determination of such amounts will also be referred to a master for hearing and determination.

It should be emphatically stated that nothing said in this opinion is meant to reflect in any way upon the integrity or ability of any state official. What they did, without question, appeared to them at the time to be the legal and proper action to take and the thing which the interests of the state seemed to demand.